UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ANTHONY J. CONWAY and PHILIP J. CONWAY, | Case No. 14-CV-1466 (PJS/BRT) |
| Plaintiffs, | ORDER |
| v. | |
| C.R. BARD, INC., | |
| Defendant. | |

Michael E. Florey and Tasha M. Francis, FISH & RICHARDSON P.C., for plaintiffs.

Yosef J. Riemer and Shireen A. Barday, KIRKLAND & ELLIS LLP; Steve W. Gaskins and Sarah H. Daggett, GASKINS BENNETT BIRRELL SCHUPP LLP, for defendant.

Plaintiffs Anthony and Philip Conway founded and operated Rochester Medical Corporation ("RMC"), a publicly traded medical-device company. C.R. Bard, Inc., ("Bard") offered to purchase RMC at a very attractive price. There was a hitch, though: Bard would go forward with the deal only if the Conways would sign five-year non-compete agreements. The Conways reluctantly agreed to sign the non-compete agreements, Bard purchased RMC at the agreed-upon price, and the Conways were paid tens of millions of dollars for their stock and other interests in RMC.

Soon afterwards, however, the Conways experienced sellers' remorse, particularly over the fact that, although they had been required to sign non-compete

agreements for the deal to go forward, the per-share price that they received for their stock was the same as the per-share price received by the other stockholders. The Conways filed suit, alleging that the non-compete agreements are unenforceable under Minnesota law because they were not supported by consideration.

This matter is before the Court on Bard's motion to dismiss. Because it is clear on the face of the complaint that the Conways did, in fact, receive consideration for signing the non-compete agreements, Bard's motion is granted, and the complaint is dismissed.

I.  BACKGROUND[1]

The Conways founded and essentially operated RMC, which develops and manufactures catheters and other medical devices for sufferers of incontinence. Compl. ¶ 10. The Conways hold "numerous patents related to urinary incontinence devices," and, in large part because of the Conways' success as inventors, RMC "grew to become a leading developer, innovator, and marketer of continence care products worldwide."

---

[1]Bard has moved to dismiss the Conways' complaint under Fed. R. Civ. P. 12, and thus the Court must treat the allegations of the complaint as true and draw all reasonable inferences in the plaintiffs' favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008). Ordinarily, if the parties present, and the Court considers, matters outside of the pleadings, a motion to dismiss must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the Court may consider materials that are necessarily embraced by the complaint, as well as exhibits attached to the complaint, without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). The Court may similarly consider matters of public record. *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

*Id.*  Anthony Conway served as RMC's President and Chief Executive Officer, and Philip Conway served as Vice President of Production Technologies.  *Id.* ¶¶ 11-12.  Between them, the Conways owned 14% of the publicly traded shares of RMC.  *Id.* ¶ 13.

In 2013, Bard and RMC began negotiating a transaction that, while styled as a merger, was in substance a sale of RMC to Bard.  *Id.* ¶ 16.  After months of negotiation, the two companies informally agreed on a purchase price of $20 per share.  *Id.* ¶¶ 17-18.  The complaint alleges—and the parties agree—that this represented "a significant premium to [RMC] shareholders."  *Id.* ¶ 16.  Specifically, the $20-per-share price represented "a 53 percent premium over $13.09, the closing price of the Common Stock on the NASDAQ on August 30, 2013, the last full trading day before the public announcement of the merger agreement."  *Id.* ¶ 18.

The complaint alleges that "Rochester Medical Corporation and Bard reached an agreement on the terms for the proposed [sale] in August of 2013."  *Id.* ¶ 17.  But the Conways concede that neither Bard nor RMC was legally obligated to go forward with the deal until it was approved by both companies' boards of directors.  Mot. Hr'g Transcript, Aug. 20, 2014, at 13 (hereinafter "T. 13").  RMC's board approved the transaction on August 13, 2013.  Compl. ¶ 19.  Bard's board also approved the transaction on or about August 13, but its approval was conditioned on both Anthony and Philip Conway signing non-compete agreements.  *Id.* ¶ 20.

Bard, RMC, and the Conways negotiated over the course of several days about Bard's demand that the Conways sign non-compete agreements. *Id.* ¶ 21. Bard was unwilling to go forward with the deal unless the Conways signed non-compete agreements, but the Conways were unwilling to sign non-compete agreements because they wanted to continue to work in the continence field. *Id.* Eventually, however, the Conways relented because they recognized that the sale "was in the best interests of [RMC's] shareholders," and they felt a fiduciary obligation to "the investors who had backed and supported [RMC]." *Id.* ¶ 22. After further haggling about the length of the non-compete agreements, the Conways each signed a five-year non-compete agreement. In the words of the complaint: "Given the fiduciary duty of Plaintiffs to act in the best interest of [RMC], and believing their refusal to sign the Non-Compete Agreement would jeopardize the merger, Plaintiffs executed the Non-Competition Agreement . . . on September 3, 2013, the same day in which [RMC] and Bard finalized the merger agreement." *Id.* ¶ 25.

The non-compete agreements recite that the Conways were "key employees" of RMC who were "intimately involved in the Business" and had "detailed knowledge of the intellectual property and other confidential and proprietary information of the Business." Compl. Ex. B at 1.[2] The agreements add that the Conways "intend[] to

---

[2]The copy of the agreement attached to the complaint was signed by Anthony
(continued...)

transfer the goodwill associated with" their interests in RMC. *Id.* at 1. In the agreements, the Conways represent that they had entered into the non-compete agreements "of [their] own free will" and for "good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged." *Id.* at 1-2, 6. The amount of that "good and valuable consideration" is not clear from the complaint or its attachments, but Bard represents that the Conways were paid "probably close to $40 million" in connection with the sale of RMC, T. 51, and the Conways do not dispute that they received tens of millions of dollars for their stock and other interests in RMC.

After the RMC sale closed—and after the Conways cashed Bard's checks—the Conways filed this lawsuit, essentially seeking to change the terms of the deal. The Conways do not seek to unravel the sale, nor do they offer to return the money that they received from Bard. Instead, the Conways seek to invalidate the non-compete agreements that they signed—the very non-compete agreements that Bard insisted on before it would purchase RMC. Although the Conways represented in the non-compete agreements that they had received "good and valuable consideration" for the agreements—and although the Conways acknowledged "the receipt and sufficiency of" that consideration—the Conways now claim that the non-compete agreements

---

²(...continued)
Conway, but the complaint states that Philip's agreement is identical, Compl. ¶ 25, and Bard does not suggest otherwise.

"provide[d] no consideration to Plaintiffs." Compl. ¶ 33. As a result, the Conways argue, those agreements are "invalid, unenforceable, null and void." *Id.*

## II. ANALYSIS

### A. Standard of Review

Bard has moved to dismiss the Conways' complaint under Fed. R. Civ. P. 12(b)(6), arguing that the complaint's central claim—that the non-compete agreements were not supported by consideration—is not "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The factual allegations in a complaint need not be detailed, but they must be sufficient to "raise a right to relief above the speculative level . . . ." *Id.* at 555. In assessing the sufficiency of the complaint, a court may disregard legal conclusions that are couched as factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### B. Consideration

Under Minnesota law, all contracts—including, of course, all non-compete agreements—must be supported by consideration to be enforceable. *Franklin v. Carpenter*, 244 N.W.2d 492, 495 (Minn. 1976). When an employer asks a prospective employee to sign a non-compete agreement as a condition of employment, consideration for the non-compete agreement is deemed to be reflected in the salary and benefits that the new employee will receive. Thus, a non-compete agreement that is

signed in connection with an offer of employment is enforceable, even if no separate consideration was paid for the agreement. *Freeman v. Duluth Clinic, Inc.*, 334 N.W.2d 626, 630 (Minn. 1983); *Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982); *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993). But if an employer asks an existing employee to sign a non-compete agreement, that agreement must be supported by new, independent consideration. *Freeman*, 344 N.W.2d at 630; *Cashman*, 323 N.W.2d at 740; *Sanborn*, 500 N.W.2d at 164.

The same principles apply to the sale of a business. Under Minnesota law, when someone sells a business (or his shares of a business)—and, in connection with that sale, he also signs a non-compete agreement—consideration for the non-compete agreement is deemed to be reflected in the amount that he will receive for the business (or his shares of the business). And thus a non-compete agreement that is signed in connection with the sale of a business is enforceable, even if no separate consideration was paid for the agreement.

For example, in *People's Cleaning & Dyeing Co. v. Share*, 210 N.W. 397 (Minn. 1926), a disgruntled employee and minority stockholder of a corporation—a man named "Share"—sought to end his affiliation with the corporation. The corporation agreed to buy back Share's stock, but only if Share signed a non-compete agreement. Share agreed. After Share was paid for his stock, he opened his own business in

violation of the non-compete agreement, and the corporation sued. The trial court enjoined Share from violating the non-compete agreement. On appeal, Share argued—as the Conways argue here—that his non-compete agreement was invalid because it was not supported by consideration. The Minnesota Supreme Court rejected Share's argument:

> [T]here was evidence tending to show that the sale of the stock and the execution of the contract were contemporaneous and parts of one and the same transaction, and the trial court found that such was the fact. In view of the evidence and the finding, it must be held that Share received the money and notes in consideration of his agreement to refrain from competing with respondent as well as in payment of the purchase price of the stock. The corporation was under no obligation to buy the stock. Neither was Share bound to sell it. The corporation saw fit to require him to execute the contract as one of the conditions of the purchase of the stock. The facts fairly warrant the inference that unless the contract had been executed the corporation would not have made the purchase.

*Id.* at 398.

The Minnesota Supreme Court reached a similar conclusion in *Bess v. Bothman*, 257 N.W.2d 791 (Minn. 1977). Harold Bothman operated an automobile repair business. He decided to get out of the business and take a government job. Bothman negotiated the sale of two of his tow trucks to Delmar Branum, who operated a nearby gas station. Branum agreed to buy the tow trucks, but only if Bothman signed a non-compete

agreement. Bothman signed the agreement, and Branum purchased the tow trucks. About a year later, after Bothman left his government job and began to operate a general towing service, Branum sued to enforce the non-compete agreement. The trial court entered an injunction against Bothman. On appeal, Bothman argued that the non-compete agreement was invalid because it was not supported by consideration. The Minnesota Supreme Court dismissed the argument in a footnote:

> [D]efendant contends that no consideration supported the covenant, that the contract was completed earlier orally and that no additional consideration was given. The district court could have found, however, that the signing was contemporaneous with and a part of the transaction and that the $10,000 therefore supported the covenant as well. *People[']s Cleaning & Dyeing Co., Inc. v. Share*, 168 Minn. 474, 210 N.W. 397 (1926).

*Bess*, 257 N.W.2d at 794 n. 1.

*People's Cleaning* and *Bess* are fatal to the Conways' claim that their non-compete agreements were not supported by consideration. It is clear from the face of the complaint that "the sale of the stock and the execution of the contract were contemporaneous and parts of one and the same transaction." *People's Cleaning*, 210 N.W. at 398. Bard "was under no obligation to buy the stock." *Id.* And the Conways were not "bound to sell it." *Id.* Bard "saw fit to require [the Conways] to execute the contract[s] as one of the conditions of the purchase of the stock." *Id.* Indeed, "unless the contract had been executed [Bard] would not have made the purchase." *Id.*

Thus, taking the allegations of the complaint as true, the Conways plainly received consideration for signing the non-compete agreements. Prior to signing the non-compete agreements, the Conways held a lot of stock in RMC that was trading at about $13.00 per share. Compl. ¶ 18. Bard was willing to pay $20 per share for that stock, but only if the Conways signed non-compete agreements. *Id.* ¶ 20. At the time that Bard asked for the non-compete agreements, Bard was not obligated to buy the RMC stock, and the Conways were not obligated to sign the non-compete agreements. The Conways eventually agreed to sign the non-compete agreements because they wanted the sale to be consummated. Their motives for doing so—whether it was to reward investors who had stood by them over the years, or to get rich through the sale of all of their own stock, or both—are immaterial. What matters is that Bard provided consideration to the Conways when Bard agreed to go forward with the sale.

That is the end of the matter. The Court notes, though, that *additional* consideration for the non-compete agreements was almost certainly found in the amount that Bard was willing to pay for the stock. Bard did not make a legally binding offer to purchase the stock of RMC until its board of directors approved that offer—and, as noted, Bard's board of directors was willing to pay $20 per share only if the Conways signed non-compete agreements. According to their complaint, the Conways are leading "innovators in the field of medical incontinence," and they built RMC into a

"leading developer, innovator, and marketer of continence care products worldwide." *Id.* ¶ 10. Obviously, RMC is worth more to a purchaser if the purchaser does not have to compete with the Conways after the sale of the business for the Conways' old customers. Thus, consideration for the non-compete agreements is found not just in the fact that Bard consummated a sale that it did not have to consummate, but also in the fact that Bard paid "a significant premium" for the RMC stock, a premium that reflected the fact that the Conways' promises not to compete with RMC increased RMC's value to Bard.

The Conways protest that, unlike the sellers in *People's Cleaning* and *Bess*, they did not negotiate directly with the buyer, and they did not enjoy *all* of the consideration paid by the buyer for the non-compete agreements. The Conways point out that they owned only 14 percent of the outstanding shares of RMC. Therefore, they say, if consideration for the non-compete agreements was baked into the $20-per-share price, 86 percent of that consideration was paid to the other stockholders.

What the Conways say is undoubtedly true, but that does not mean that the Conways received no consideration for signing the non-compete agreements. It simply means that they received only some—not all—of the consideration that Bard paid for the non-compete agreements. Under Minnesota law, though, the *amount* of the consideration received by the Conways is immaterial as long as they received *some*

consideration. *See Pine River State Bank v. Mettille*, 333 N.W.2d 622, 629 (Minn. 1983); *Kielley v. Kielley*, 674 N.W.2d 770, 778 (Minn. Ct. App. 2004). And, again, the Conways clearly received *some* consideration for signing the non-compete agreements. Bard agreed to go forward with a sale that it was not legally obligated to consummate—a sale that made the Conways very wealthy and that rewarded the investors who had stood by the Conways over the years. Bard's going forward with the sale, in and of itself, provided consideration to the Conways for signing the non-compete agreements. Moreover, additional consideration was found in the generous price paid by Bard for RMC stock—a price that reflected the undisputable fact that RMC was worth more if Bard did not have to compete with the Conways.

That disposes of the main claim made by the Conways. A couple of additional matters need to be addressed:

*First*, in their brief—but not in the only count of their complaint—the Conways allege that the non-compete agreements are invalid because the Conways were coerced into signing them. It is not clear if the Conways are serious about pursuing this claim; at oral argument, their attorney said that "if the only thing that was left in the case was a coercion claim . . . I don't believe we would pursue that as an independent, standalone only claim." T. 4. In any event, a claim of coercion can void a contract under Minnesota law only when the free will of one of the parties has been destroyed by physical force or

unlawful threats. *Bond v. Charlson*, 374 N.W.2d 423, 428 (Minn. 1985); *Wise v. Midtown Motors, Inc.*, 42 N.W.2d 404, 407 (Minn. 1950). No such coercion is alleged in the complaint, and the "coercion" described by the Conways' attorney at oral argument—which is basically that Bard engaged in hardball negotiating tactics[3]—falls far short of what is necessary to void a contract.

*Second*, in their complaint, the Conways allege not only that the non-compete agreements are invalid for lack for consideration, but also that those agreements are "contrary to public policy under Minnesota law and to the public interest in Minnesota and the United States." Compl. ¶ 34. When asked at oral argument to clarify this allegation, the Conways' attorney responded that it was "intended to invoke the blue pencil doctrine." T. 6. (The blue-pencil doctrine "allows a court to modify an unreasonable noncompetition agreement and enforce it only to the extent that it is reasonable . . . ." *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 n. 1 (Minn. 1980).) Again, it is not clear if the Conways are serious about pursuing this claim; their

---

[3]"I think that the coercion here [is] leveraging the fact that these two people were officers of the company who owed obligations to all the other shareholders and were put to this choice of, in essence, blowing up a deal that they had spent months working on, that they believed was in the best interests of the shareholders, put to that choice versus signing non-competes that plainly had no consideration." T. 5.

It should be noted that the Conways stop short of claiming that their fiduciary duties to the shareholders of RMC imposed on them a *legal obligation* to sign the non-compete agreements. T. 13-15. Neither side has cited any legal authority supporting such a proposition, and the Court is not aware of any such authority.

attorney said at oral argument that "if Your Honor holds that this is a contract supported by valid consideration, then it is not our intent to pursue a separate standalone [blue-pencil] action." T. 6.  In any event, the complaint does not come close to adequately pleading a blue-pencil claim; it neither mentions the doctrine nor identifies any aspect of the non-compete agreements that is unreasonably overbroad.

In sum, the Court finds that, assuming that all of the factual allegations of the complaint are true, the non-compete agreements signed by the Conways were supported by consideration.  Bard's motion to dismiss is granted, and the complaint is dismissed.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion to dismiss [ECF No. 7] is GRANTED.

2. The complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  February 12, 2015           s/Patrick J. Schiltz
                                    Patrick J. Schiltz
                                    United States District Judge